3-14-0690 Angela McIntyre, Administrator of the Estate of Donald McIntyre, deceased. Appellant cross-appellee by James Carter v. Rajesh Balgani and Illinois Lung Institute Ltd. Appellees cross-appellants by Craig Hunrath and OSF Healthcare System. Appellees cross-appellants by William Hardy. As I understand it, the parties have, and we've accepted that, agreed format for the time period? Yes, we've come to an agreement. We have a very complex procedural situation here, so we're basically arguing the cross-appeal, at least in terms of procedure. So it was acceptable to everybody? Yes, sir. Okay, thank you. Let's proceed. My name is Craig Hunrath, and I represent Dr. Balgani. This is a tragic case we're dealing with here. Mr. McIntyre walked into the ER under his own power at about 11 o'clock in the morning, complaining of low back pain and blood in his urine. And then things took off. His condition deteriorated rapidly. Within an hour, he fainted. Shortly after that, he went into cardiac arrest. The ER was scrambling to keep up with this as his symptoms mounted. Test results indicated cardiac issues, sepsis, pancreatitis, infection, flu-like symptoms, meningitis. The list goes on and on. Fourteen hours after he arrived in the emergency room, Mr. McIntyre passed away. This is an unfathomable tragedy. One can only ask why this occurred, and more to the point, is there anyone to blame for it? Now, highly trained experts on both sides, both for plaintiff and defendant, focused on a single question. Did Dr. Balgani reach the standard of care by failing to transfuse uncross-matched blood? And I submit that that is a false issue. It has absolutely no relevance to the appropriate standard of care. Experts for both sides agreed on two points. The first is that this was an extremely rare medical condition. None of them had ever seen anything like this. A hemolytic anemia that was this aggressive is absolutely unheard of. Second thing that they agreed upon is that this is a condition that is not treated in the ICU. As a matter of fact, it's usually treated as an outpatient basis. All of them were agreed, on both plaintiffs and defendants, that the appropriate thing to do was for the ICU physicians to contact a hematologist and follow his directions. Now, ICU physicians are generalists. They're like appellate lawyers. They take whatever case comes through the door. If you have a cardiac issue, they call in a cardiologist. If you have head trauma, they call in a neurologist and allow that specialist to direct the care. Now, in this case, Dr. Bolton and Dr. Balgani did exactly what they were supposed to do. Once they determined that they had a case of autoimmune hemolytic anemia, they called in a hematologist and followed his advice. Accordingly, there are only two inquiries relevant to the standard of care. One, did Dr. Thomas give the correct advice? And two, did the ICU physicians follow that advice? But the jury was never given an opportunity to address those issues. Now, why is that? The reason has its origin in the trial court's ruling that any suggestion, any hint, any attempt to elicit testimony suggesting that Dr. Thomas was negligent was prohibited. Now, this is in direct contradiction to the Illinois Supreme Court's decision in Leonardo v. Loyola University, and it effectively deprived the defendants of a defense. Now, the trial court ruled that Dr. Thomas had no physician-patient relationship with Mr. McIntyre, and therefore no duty of care. He could not be held liable. Now, even if we assume that that ruling is correct, that has nothing to do with the appropriate standard of care. The fact that he cannot be found liable does not have any relevance to whether Dr. Thomas, I'm sorry, whether Dr. Balagany and Dr. Bolton reached the standard of care. Now, it's important to keep in mind that at the very outset of this case, it was not Dr. Balagany and Dr. Bolton that were the focus of this complaint. It was actually Dr. Thomas. And when you look at the expert disclosures from the plaintiff's experts and you read their depositions, you'll find that they blamed Dr. Thomas for this entire problem. The doctor, I believe his name is Dr. Abrams, summed it up this way. He faulted Dr. Thomas for, quote, not doing what was necessary to keep the patient alive, unquote. I can't think of a more succinct way of stating that somebody has breached the standard of care. Now, the jury never heard that testimony. And the reason for that is due to the trial court's order that for there to be a violation of the standard of care, there must be a duty of care. Now, that's the critical point here. And I want to repeat that. In order for there to be a violation of a standard of care, there must be a duty. And I submit that there is absolutely no case law authority that supports that proposition. Now, my client did exactly what he was supposed to do. He called in a specialist. The decision whether to transfuse uncross-matched blood was not Dr. Baligani's decision to make. This was a decision that Dr. Thomas could make. He was the only person who could make that decision. And there was strong evidence that my clients did exactly what Dr. Thomas told them to do. Now, there's a fundamental principle of law that a defendant is always free to argue that something other than his own negligence was solely responsible for the plaintiff's injury. When the trial court barred defendants from hinting, suggesting, or listing any testimony that might indicate that Dr. Thomas was negligent, he effectively deprived us of a defense. And in doing so, he directly contravened the Illinois Supreme Court's decision in Leonardo v. Loyola University. The plaintiff's entire case is based on the presumption that defendants did not follow his instructions. Now, Dr. Thomas gave two depositions. The first deposition, he said, well, I told them not to transfuse uncross-matched blood. Second deposition, he changed his story. He said he did tell my clients to transfuse uncross-matched blood. So why is it that we didn't call him as a witness? Why didn't we call him to the stand? The reason is simple. We would be calling a witness to the stand whose critical testimony as to what instructions he gave and whether we followed them is critical to this case, and yet we are barred, absolutely prohibited, from suggesting in any way that he may have actually been responsible for this injury. Now, think of how that testimony would play out. We might ask, did you ask about this test? Did you ask about the results from that test? What did you ask? All of those questions can be viewed as suggestions that Dr. Thomas was really the person at fault. All of those questions would have been subject to an objection and probably would have been sustained. Speculative, though, isn't it? Speculative. I think it's no, Your Honor. I would disagree. I think that the trial court's ruling, he was adamant that we cannot offer any evidence or elicit any testimony suggesting that he was negligent in any way. As I see it, it was absolutely certain that any testimony we elicited from Dr. Thomas as to what he did, what he asked, did he ask all of the necessary questions, all of that suggests to the jury that he may have been negligent and those questions would have been objected to and sustained. But choices were made. It was decided not to call him. Defendants did not call him for that reason, because we were barred from asking any question that might indicate that he was responsible for Mr. McIntyre's death. And, of course, then we have to, then it's a matter of conjecture of the extent of the bar. The extent of the bar? I don't see that as a matter of conjecture at all. And I think when you look at the trial court's ruling, he is very specific. He says any testimony suggesting that this will cast Dr. Thomas in a bad light is barred. And he went further. When there was another motion in liberty in regard to the other specialist, Dr. Farrell, the infectious disease specialist that we called in, the trial judge ruled that we were barred from asking him about the proper role of a consulting physician because the jury might draw a link between that testimony and Dr. Thomas. This was a complete bar. The reason I'm confused about some of this is many times, I believe, in a medical malpractice trial, you have preliminary rulings by the judge all the time, a lot of them, because there's a lot of things going on in the discovery and pre-trial aspects, obviously, in a medical malpractice case. But the attorneys, as well as especially the judge, sometimes it's in context when you realize the import of making a ruling one way or the other. And the context can really be highlighted when you're in the middle of the trial or just before the trial when someone asks for a motion to be considered under preliminary rulings. Here, none of that was done. I mean, you know, there wasn't anything at the trial level where the judge would be pointed out to the judge, look, in the context of what you're dealing with and in this trial, this is important, relevant information that we have a right to draw. And there you call a witness, you ask the witness questions. Your Honor, I would disagree with your characterization there, respectfully. And this was argued in detail prior to trial, and we put on an offer of proof as to Dr. Thomas's negligence. The trial court's ruling barring us from raising a sole proximate cause defense was in direct contravention of the Illinois Supreme Court's ruling in Leonardo v. Loyola University. Now, what you seem to be suggesting here is that even though this ruling is absolutely in direct conflict with Illinois Supreme Court precedent, that we should nevertheless put on a witness who is hostile to our case, at least it was not initially, only in the second deposition that he raises, but he is hostile to our case, and yet we are absolutely handcuffed. We are barred from examining his role in the outcome of this case. We can't touch it. We can't come near it. And the court was very explicit on that. So we put this witness on the stand. He states that they disregarded my orders, and that's it. That's as far as we are going to get. We can't talk to him about what questions he asked, what was the nature of the conversation. We can't do any of that. Can you go to his prior statement, his first deposition? Can you present that? Absolutely not, because right there, if we mention his prior deposition, where he stated, I told them not to transfuse uncross-matched blood, well, we've already heard the testimony of the plaintiff's expert witness, and he said if you do that, you're negligent as a matter of law. We can't mention that. We're barred. He is out of the case, and it all comes back to this one principle. If there's no duty of care, there can be no breach of the standard of care. The judge did not prohibit him from going into what happened, what happened in this case. And if the witness is on the stand, and you're going through the narrative about what happened, how is that barred? I mean, I don't understand. Let me ask you a simple question. When you spoke to Dr. Bolton, did you ask her about the results of this specific test? No, I did not. Objection, Your Honors. Moved to strike, that suggests that Dr. Thomas made a mistake and breached the standard of care. Jury admonished to ignore the evidence. Right there, any kind of inquiry into what he did or did not do, And when you read Dr. Abrams' deposition early on, where he focused on Dr. Thomas' conduct, he went through a long list of questions that Dr. Thomas was required to ask. We would have put Dr. Thomas on the stand, and we would have gone down that list that the plaintiff's own experts said, we need to know whether he addressed those issues. And in every single case, those questions are going to be objected to, and under the trial court's specific ruling would have been sustained. You were barred from eliciting an opinion about a violation of the standard of care. Oh, more than that. Much more than that. Without even mentioning the word standard of care, if we elicit any testimony that even hints that he was at fault, or played any role in this case, that caused Mr. McIntyre's death, that's in violation of the court's explicit order. Obviously, you're suggesting that the judge barred you from calling this witness. Oh, not explicitly. I think that the court barred us from any meaningful examination of this witness. We could call him, but we wouldn't be able to examine him on anything. We wouldn't be able to ask him, what did you say? What did you do here? Because if we do, and he says, no, I didn't ask about that test. Well, there we've given the jury evidence to believe that maybe this was Dr. Thomas' fault. That is in violation of the court's order. Yeah. Obviously, he was an occurrence witness. He was there part of the time, right? He was involved. Oh, I'd say he was very involved. So he was involved, and you're saying you were barred from asking him anything about the involvement. To the extent that... The factual matters. Yeah, to the extent that his treatment recommendations and his questions, his inquiries could possibly be viewed as prejudicial to him, or to give the impression that he may have made a mistake here, that he may have been partly at fault, we were barred from that. Because under the trial court's erroneous ruling, because he had no duty of care, we could not address anything involving the standard of care or his role in how this patient was treated. I think it's also important to point out that Dr. Thomas was on the plaintiff's witness list. He intended to call him initially, but he didn't do it, and you ask why that is. And the reason is this. He convinced the trial court that if Dr. Bolton testifies as to her conversation with Dr. Thomas, it's hearsay. And that, too, is a plainly erroneous ruling. Out-of-state court statements offered to prove its effect on the listener's mind and explain why she acted as she did is not hearsay. And, again, that's Leonardo vs. Loyola University. Illinois Supreme Court precedent tells us that that's true. Every time Dr. Bolton tried to explain what happened, what did Dr. Thomas tell you, so we can get to the critical question here, which is, did we follow Dr. Thomas' advice? Objection. Sustained. Jury was admonished to disregard the evidence. Now, did the evidence come in in broad strokes? Yes. We were never allowed to go into any detail. In broad strokes, it was allowed, and yet sometimes it wasn't. And this was pointed out in the plaintiff's statement of facts. He quotes from the trial transcript, and he says, Here, here's a spot where the jury was informed completely that Dr. Bolton spoke with Dr. Thomas and he told her there should be no more transfusion of uncross-matched blood. You look at that trial transcript, look at that page, and you'll see that plaintiff's counsel objected, and that testimony was stricken from the record, and the jury was admonished to ignore it. So we have a jury that's, on the one hand, is hearing, Yes, she spoke with Dr. Thomas and he told her not to transfuse blood. On the other hand, that evidence is not substantive evidence. That's another phrase he used. The jury must disregard it, and it's stricken from the record. Your Honor. Thank you, Your Honor. We urge you to reverse. Thank you. Counsel. Counsel. Are you going to? Yes, Your Honor. I'm not sure how much time you'll allow me. We agreed to split our time, but I think Craig went over. Do I have some time, Your Honor? Five minutes. Five minutes? That's sufficient for what I'm going to argue. William Hardy on behalf of OSF. As you know, we're in this case only on an apparent agency theory. I'm going to, because of the limited time, I'm going to, without taking anything away from our apparent agency arguments, I'm going to just defer to our briefs because I think I hit all the points in the refinery, but I don't want to take anything away from it. What I want to talk to the Court about is the $1.1 million award for lost income, and that's addressed in detail in the briefs, but it's a very important issue because it is the bulk of the damages in this case. Now, the plaintiff in this case, and I agree with Mr. Unrath, this is a terrible tragedy, but, of course, you know, when we're talking about damages, the plaintiff does have the burden of proving those damages with reasonable certainty. And the way the plaintiff chose to do it in this case is through a lost profits analysis. He disclosed to an expert before trial, Dr. Sackler, who was going to testify reportedly that Plaintiff's business, this printing business that he started out of his garage three years after leaving his employment at RLI, would have been making $125,000 a year by the time, by 2013. He decided not to call Dr. Sackler. He didn't present that testimony. Instead, he relied only on Curtis Warner, who was not an expert. I mean, he's a CPA, certainly, but he was the CPA who prepared Mr. McIntyre's tax returns. And his testimony, nobody disputes his testimony. Plaintiff's counsel wants to talk about how he said, well, the business was going to grow. Well, we point out the testimony in detail, and it's undisputed. He could not say that with any reasonable certainty. In fact, he made it very clear that all he knew was that he lost money the first year. The second year, he made $11,000 to $12,000. The third year, he had $65,000 in gross revenue as of the time of the plaintiff's death, which is actually substantially less than the previous year. So the notion that it was growing is speculative even on his testimony. But the point is that under the case law, and I understand that the review of a damages award is typically manifest way of the evidence, but as we point out, if you're dealing with a new business, courts have carefully scrutinized that, and that's in all different types of cases. And if you're dealing with a new business, you have to have an established record, a record of lost profits, and typically of profits before, of basically an established business. There's no evidence in this case that this was an established business, period. And the notion, I mean, here's what happened. He called Mordelman to give this speculative testimony. He brought out, and the jury did hear that he made $117,000 at RLI, but that's totally irrelevant because he stopped working at RLI three years before. Plano presented no evidence that he could have gotten that job somewhere else. He didn't present any expert on diminished earnings. He relied, Plano's counsel relied solely on this lost profits analysis. And the cases say you can't do that in a case like this where you're dealing with a newly established business. So that award of $1.1 million is pure speculation and conjecture, and all you have to do is look at the way the Plano's counsel argued it, because he argued it as if he had presented Dr. Sattler. He said, look, he was making $117,000 back then. Let's just assume that he would have made $125,000, the business was growing, so on and so forth. That's supposedly what Dr. Sattler was going to testify. And then he said, award $1.25 million based on that figure. He said, actually amounted to much more than that, but reduce it to present value. But the point is the case law establishes that you have to have much, much more than that. And there's case after case on that. The Tri-G case, many cases from the Supreme Court. So at a minimum, that award of $1.1 million needs to be vacated. Am I out of time? So, again, I would rely on a brief for anything else unless the court has further questions. Thank you, counsel. Thank you, Your Honors. Thank you very much for the additional time. Counsel. May it please the Court. James Carter on behalf of American Tires Council. As I'm sure you surmised from reviewing the briefs, there are two different pictures that were painted by the evidence and argued. The defense made a conscious choice when they initiated the trial of this case to choose to try to establish that there were all these other medical issues surrounding Mr. Mack retired. The plaintiff, on the other hand, elected to proceed with the evidence based upon the facts in the medical record. From the emergency room on September 6th when he came in and was first noted to be slightly low on blood, I think I previously requested to be able to refer to one exhibit. That's in the record. This is exhibit 4B. It was first and it's found that a reference to it first is found in volume 5, page 2, 437. It was admitted in evidence for use as a demonstrative device prior to opening statement and was used by me with all of the other medical witnesses, including the defendants. So 13 to 16 grams per mecaliter is what the OSF lab considers normal range of hemoglobin. Hemoglobin, as I'm sure you're aware, is what binds oxygen into the red blood cells and allows then the oxygen to be delivered. If hemoglobin drops to a dangerous level, the engine stops running. You can't get fuel. So he showed up on the 6th with 11.1, slightly in need. Less than 24 hours later, he's brought to the emergency room at 12 a.m. He arrives at the emergency room at 11.30 a.m. on the 7th of September and now his hemoglobin is at 7. That's a significant decline. Dr. Abrams, hematologist from Penn University, indicated that based on his analysis, he was hemolyzing, losing red blood cells at approximately a gram an hour, I think is what he said. So Madison knows, and he went to the emergency room the second day. There wasn't confusion. The record is clear. The medical chart shows that the emergency room doctor said that he was likely, he had hemolytic anemia, and it was likely autoimmune, and autoimmune means simply that something in your autoimmune system goes haywire and then an additional antigen appears or attaches to your red blood cells. Now that's a foreign antigen, not recognized, and so your blood is filtered through the spleen constantly. The spleen is like the policeman. If it sees something that's not supposed to be there, it'll chomp down. Well, what happens is as your blood circulates, the spleen starts literally eating on your red blood cells to the point where they no longer are able, the hemoglobin is no longer contained in there. In other words, it evaporates, it goes into the system, and it has to be absorbed by another body called haptoglobin. But when your body loses the hemoglobin, when your body loses the ability to attach to oxygen, you then are placed in a life-or-death situation. Autoimmune hemolytic anemia is typically treated when people are chronically ill, not in an emergency room, but the evidence was unrefuted even by the defense experts. Du Bois Blanc was brought in, critical care doctor from New Orleans. He stated quite clearly, and so did Dr. Miller, who was the vice president and medical director of OSF, that the purpose of the ICU is to provide the highest level of medical care, the highest level. They staff it with an attending critical care physician at all times. Underneath this critical care physician, because it's a teaching hospital, they have residents. But the critical care physician is responsible. The critical care physician, according to Dr. Miller and confirmed by Dr. Du Bois Blanc and plaintiff's expert Dr. Albertson, clearly, clearly must, which should have known, how to treat autoimmune hemolytic anemia. And if he didn't, he should have looked it up real quick or gotten some information and acted upon it. In this case, the plaintiff got Dr. Balagany to admit, under oath in front of the jury, because of depositions I took before the case, that he did not know how to treat autoimmune hemolytic anemia at the time he was taking care of Dr. McIntyre. In fact, the record shows he never even saw Dr. McIntyre, not once. It was a Labor Day weekend. He wasn't there to see the patient. The patient was primarily left under the control of Dr. Bolton. There's a lot of things I would like to respond to that were stated, and I think I should try to do that quickly. So the condition in the ICU was, at 4.30, Dr. Bolton was called and brought down to, she came to the ED to see the patient, McIntyre, because Dr. Hassler, the physician in charge of the emergency room, said he needs to go to the medical intensive care unit. At the same time, she ordered blood. Now, the way you treat, everybody agrees with this, every witness, the way to treat autoimmune hemolytic anemia is you give blood, not to overcome the process, but to stabilize the patient. So how do we know that worked? It worked because she ordered blood, and at 5 o'clock, at 4.23, on 9.7, another blood draw was made, and now he was down, from the time he got in the emergency room to 4.23, his hemoglobin level was 6. The record shows that they called for two of these four units of blood, which they had asked for and had been evaluated by the lab and approved, and the record shows that we established that those four units were available. They called for two of them to be immediately transfused. It was, quote, urgent. That word is in the record. The doctor that gave the order agreed that that's what it was. It was urgent. It's life-threatening. They gave it to her. It's also unrefuted medically, because I got, I was able to get, the doctor, the boy block, the defendant, a lot of things I was able to do by cross-examining the defendant and the other doctors on points that maybe they weren't wanting to be cross-examined about, but one of the key things is medically they know that if you transfuse one unit, you expect to see an immediate bounce-up within an hour. In other words, it would raise the level. So from, like, six to seven, you get two units. The boy block said this to me. It's in the record. If you get two units in a person that's hemolyzed, a person that's normal, you get doubles. But a person that's hemolyzed, they're eating their red blood cells, would go up one point for each unit. So it would be up to eight if he was at six. Now, how do we know that worked? Because that was the one and only time my client was given blood. They gave him no blood. The way you treat it is you give blood, stabilize it, stop the hemolysis from killing him, and then bring on steroids in what they call immunoglobulin IV, by IV. They're both to suppress your immune system, to damp down whatever it is that's kind of chemically gone haywire. If, ultimately, that wouldn't work, then the next thing they do is they go in and do a splenectomy. My client would have been alive if they had given blood and started the treatment. The evidence is unrefuted, because it was five hours later at 9.57, from 4.23 to 9.57. The measurement was 6.3. And that means that he had stabilized and, in fact, gone up a little bit. That meant there had been a positive effect from the blood he was given. Yet they gave him no more blood. That's what we claimed. I mean, it wasn't that we said you had to rely on Dr. Thomas. It was the defendant physician, Dalladoni, was responsible for the patient, and he had the obligation to treat the patient, and he didn't do it. He seized it. Pardon me? He seized the blood. Yes, thank you, Your Honor. He did. He, Dr. Thank you so much. That's a great point. Dr. Bolton is the one that wrote the record. Dr. Dalladoni put nothing in the record. Dr. Bolton put in the record that she was told by Dalladoni, don't give any more blood. But that same note says she was told they should start IVIG and steroids. And when did those get started? The steroids were started about an hour or half an hour before he coded. The IVIG was given as he was coding, and the other two units of blood had already been cleared for him. They had been screened for antibodies and approved. They weren't given until he was dead on the table, according to Dr. Bolton. He was in the middle of the code, and they gave him the other two units of blood. They gave nothing to this man, nothing. Nothing. I need to address, I guess, the argument that was just made about the damages. If this court accepts the theory advanced by the defense, then no one who is transitioning jobs or moving from one job to another could ever hope to seek to recover what their loss of future earnings may be. We didn't just present this to Wergelman. We presented his wife, Angela, who testified at length about what he'd done, what kind of person he was, the industriousness, the habits, his work ethic, his teaching process of his children, all the things. This man, the uncontradicted evidence is this man was the kind of man I would aspire to be in life. We all would. He was a great person, took care of his family, worked hard, worked his way up from the bottom to become vice president at RLI Insurance, which is a fairly substantial company in Peoria. He was in charge of their premise shop, but there's evidence unrefuted as well. He had, and this is from Wergelman, and I believe his wife, Boyle, said, he had always had a dream of having his own business. His job was not eliminated. It was going to be, but he created that. That's also what happened. He created, he didn't create the printing shop. This company had printing shops because they used to print contracts and shirts. Then he went to the management and said, I have an idea. We can turn this into a profit center instead of just machinely sitting here costing. What did he do? He went out, developed a plan, activated the plan, got the business. He went out and recruited business. The testimony was that he had business coming in. Even at the time of his death, he'd already gotten Maui Gym, the Paradise Hotel and Casino, Peoria Civic Center, and two or three others, a large banking firm, and they came to him and asked him to get bigger equipment because they wanted to give him more business. Now, I never told the jury that you need to look at what he made at RLI and decide that that's what he would make. I said, I believe, I'm trying to remember exactly, but I believe. I said, look, this is up to you. You've heard all these things about all the factors that go into who this man was. You're entitled to consider what he would have done with himself in life, but I guarantee you, knowing who he was, he would not have left RLI, left that position, if he didn't believe and think he had a reasonable likelihood of succeeding. And I said, even if his printing business doesn't succeed, he's going to succeed because he was that kind of person. And I suggested that this is my opinion, but I think that he would get to a point where he'd be generating at least as much money, if not more. I asked for a figure of 1.25 million. I said, I think that's the present cash value, but you have to figure that out for yourself. They didn't listen to that, but they came back, I think, 1.1. There's nothing speculative about this. This isn't like somebody who's a bartender. I think that was the Morris case counsel referred to, bartender, who then puts on evidence about being a hotel owner. This is a case about a man whose all of his attributes, all of his process in life of success, growth, were laid out before the jury. And the permanency of his injury and the effect of that permanency was for them to accept and consider in conjunction with who this man was and had been and what would be expected of him in life. Two minutes, please. It's not true. I have notes I could find, but I'd just waste time. I made all these notes about where things were in the record because so many things that were said by counsel and my honorable opponent in his advocacy, I believe, are not in the record. For example, I will say to you unequivocally that there's no evidence in the record that would show that Dr. Thomas reversed himself. In fact, I have this right here. I'll do this and then the issue I want to address real quickly of what they were prohibited from addressing. This was a quote. This is in the record. This is at C-1284. I believe this is in the record for the case. This is my questions to, and this was an exhibit to, the response to the motion for summary judgment by Dr. Thomas. My questions to him. Question. When you say he, Mr. McIntyre, received treatment, that was, quote, frankly textbook, unquote. Is that your opinion based upon a review of the medical record? A, answer. The treatment of autoimmune hemolytic anemia, as I just discussed with you, is steroids and immunoglobulin. Question, yes. Answer, and blood transfusions if needed. Yes. Quote, from what I recall, that's all I knew about this patient. He had autoimmune hemolytic anemia, and I thought he had received, I was under the impression that he had received all three of these modalities of treatment. Question, had or was going to receive shortly after your conversation? Answer, had or was going to receive? Yes. What he said in his second deposition that the defense didn't like, because when counsel for Dr. Balaghani wanted to cross-examine Dr. Abrams, who was our lead-off witness and was a hematologist, and thought he was going to waive the fact that we had proceeded against Dr. Thomas but were now precluded from doing so by reason of some judgment motion, I then was able to ask Dr. Abrams, what is it you read in that? He said, no, my opinion isn't that he's at fault. I don't fault him now because of what I read in his second deposition. And that allowed me to say, well, let me ask you this. Did he say this? Did he say this? Was that the testimony that was unobjected to my line of questioning? Dr. Abrams said, yes. What he said was that he never said that he stopped the blood. He said, I never did that. I thought they were going to continue giving blood. So it's a fiction. And that fiction was advanced at trial. I'd like to have time just to make one more point, if I may, This is what happened was because of, with all respect to the trial court, and it was Judge Dubicki, with all respect to him, I believe that was a wrong ruling. Hence, I'm going to discuss that case with you shortly on Dr. Thomas. But the law is proximate cause is limited to a cause. The definition of proximate cause is it might be one, two, or more combined causes. What happened was when summary judgment was granted to Dr. Thomas, that opened the door for the empty chair defense, which is what they did. They had made no claims against Dr. Thomas at any time prior to the trial. And so they thought that they would try to do this. Now, the court did grant a motion eliminating that said, he said the law of the case is there's no negligence because there's no duty. That's been determined by Judge Dubicki. Thomas had no duty. Hence, it's not that's the law of the case. The court's already made a decision that there is no duty. If there's no duty, then he can't have a standard of care because he didn't have a duty to the patient. The court did say, however, quote, and this is when he rules, reissued his ruling right before I was going to put Dr. Abrams on the stand to begin the trial. They brought up again about this intervening causation. Here's what Judge Shore did. Judge Shore, I thought he just made an effort to try a very good case and try to keep the issues clean. He said, quote, and this is found in our brief. And it's CA 8 through 10 or 11 attached to my response brief, reply brief and response brief. The issue of intervening cause or approximate cause is far different from the issue that Judge Dubicki was addressing, which was an issue of whether there was a physician-patient relationship or duty owed to the patient. And it's also far different from my ruling that this case is not about whether or not that doctor, Dr. Thomas specifically, breached the duty and standard of care, but just like any other intervening circumstance, whether it was an ambulance crash on the way to the hospital or any other number of things, if an intervening act or preceding or superseding act can be a claim by inference from the evidence to be a sole proximate cause, that's what Leonardi says, or the sole proximate cause of the injury suffered, then it's admissible for that purpose. I understand that's even more a broad concept because you don't have to prove that it was below the standard of care. That's Leonardi. There's no requisite to prove the standard of care violation. All you're really proving is causation, but I think that's the law, whether it's an act of a physician or pharmacist or any other person having by some inference or implication an effect upon the chain of circumstances which led to the injury. And obviously, in this case, you would need expert testimony to say something of that nature or reliance by somebody who was in the chain of circumstance. And he said, based on what the defense is telling me, apparently that's forthcoming. So he permitted them, and I attached two of our briefs or appendix that showed you how many times Dr. Thomas was mentioned. I brought with me portions of the closing arguments by the defense, which they spent a lot of time telling the jury, Dr. Thomas is the one that's to blame here. They weren't precluded from saying anything. They could have called it. They didn't want to call it. Why? For the same reason they didn't cross-examine Farrell, the infectious disease doctor, when I put him on the stand and he started to change his testimony so I could ask him questions. That was a trial decision I made. They didn't cross him, even though Dr. Bolton swore that he said, don't give any more steroids. In his deposition, he said, no, even in the face of an infection, give the steroids. You know who established that? Dr. DuBois Blanc in cross-examination. I got him to admit that because he relied on Farrell's deposition testimony to give his opinion. Does the court have any questions? I apologize. Thank you, counsel. Thank you, court. Do I have time for a short rebuttal? Just a few brief points. No one could tell whether the patient had autoimmune hemolytic anemia until they received the results of a Coombs test. That didn't arrive until sometime after 10 o'clock. At that point, they knew what they were dealing with. At that point, they contacted a specialist, a hematologist, and followed his directions. That is all that is required under the standard of care. All experts who testified in this case stated that an ICU physician is not competent to deal with a rare condition, an aggressive condition like this. As a matter of fact, one of the experts even suggested that Dr. Thomas, that most hematologists would have a difficult time dealing with this case. This is an extremely rare medical condition. As far as Dr. Thomas recanting or changing court... The deposition was presented to the jury, correct? The deposition? No, the position that this was a very rare occurrence. Oh, absolutely. From experts on both sides. Just an uncommonly rare condition. As far as Dr. Thomas' changing testimony, I'd refer the court to Plankett's expert's testimony, where he testified before the jury. He said, well, initially, Dr. Thomas said that don't give any more uncross-matched blood. And then he said, but he recanted that later. In his second deposition, he just said the opposite. So that's opened the door to a claim against my defendants. The key point is this, is that our standard of care, Dr. Balaghani's standard of care, was to consult a hematologist and follow his instructions, and he did that. The fact that we have a chart here showing the hemoglobin going up and down, these are decisions that had to be made by the hematologist, not Dr. Balaghani. It was not his decision to make. In terms of the trial court's ruling prohibiting us from discussing Dr. Thomas' role, I refer the court to volume 2, page 29, where the court made its ruling. The court explicitly prohibited the defendants from suggesting that Dr. Thomas breached the standard of care or was negligent in any fashion. That's pretty clear. We had no way of even hinting to the jury that Dr. Thomas was in any way fully or partially at fault. We believe that we were effectively deprived of our defense. Thank you, Your Honor. Thank you, counsel. Just one minute, sir. If you may. Very quickly. Thank you. We're not saying that whenever someone changes jobs, they can never prove any lost income. There are many ways for the plaintiff to go here. He could have called his expert on the lost profits, but he also could have disclosed to an expert to say, look, here's a market analysis. Here are the jobs that would have been available. Here's the average salary for somebody with his skill set. Here's his educational background. So on and so forth. Someone to make that projection. They didn't do that. They relied solely on one of them, not their expert. And if you want to know the way Mr. Carter argued it to the jury, it's right on pages 6 and 7 of our brief. And it's based on him making $125,000 in that new business. And that's the only explanation in this record for it. We don't dispute that he was a hard worker, he was industrious, he was great in his family. This is a terrible tragedy, what happened to this man. But that has nothing to do with whether he proved under that theory. His theory was lost profits. He could have presented it a different way. They didn't do it. And that's pure speculation under the case law. Pure speculation and conjecture. And there's just simply no support for $1.1 million the way it was presented. There are other ways to do it. Thank you, Your Honors. Thank you. Thank you, everyone, for your arguments. We'll take a short recess for a panel change. We'll take this case under advice.